IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-364

Filed 31 December 2024

Johnston County, No. 17 CVD 2620

AMY STALLINGS KEITH, Plaintiff,

v.

CHRISTOPHER DARRELL KEITH, Defendant.

Appeal by defendant from order entered 10 August 2023 by Judge Jimmy L. Love, Jr., in Johnston County District Court. Heard in the Court of Appeals 22 October 2024.

*The Armstrong Law Firm, P.A., by L. Lamar Armstrong, III, for plaintiff-appellee.*

*New Direction Family Law, by Christopher R. Hicks, for defendant-appellant.*

ZACHARY, Judge.

Defendant Christopher Darrell Keith appeals from the trial court's permanent child support order. After careful review, we affirm in part and remand for additional findings of fact.

## I. Background

In this case, the facts are not disputed on appeal. Accordingly, we recite the pertinent facts as found by the trial court.

Plaintiff Amy Stallings Keith and Defendant married in June 2004, separated

in May 2017, and divorced in June 2018. Two children were born of the marriage, the first in February 2009 and the second in December 2010.

On 23 August 2017, Plaintiff filed a complaint against Defendant seeking child custody and child support. This matter came on for hearing in Johnston County District Court over four days between 12 May 2022 and 14 June 2023.

On 10 August 2023, the trial court entered a permanent child support order. In its order, the court made the following findings of fact pertinent to the issue of child support[1]:

> 7. Plaintiff is employed with the Johnston County Department of Social Services as a Supervisor for the Foster Home Licensing. She earns $5,333.33 gross income per month.
>
> 8. Plaintiff pays $450.00 per month for the health insurance of the two minor children.
>
> 9. Plaintiff pays $43.76 per month for the dental insurance of the two minor children.
>
> 10. Plaintiff pays $50.00 per week per child for the 42 weeks for their after-school care. Plaintiff pays an additional $100.00 as a registration fee for the after-school care program. Plaintiff pays $220.00 per week for 10 weeks for childcare during the summer.
>
> 11. During the marriage [one of] the parties' minor child[ren] . . . attended Camp Don Lee and/or Camp Seafare during the summer vacation from school. Since the parties separated, she has attended Camp Don Lee twice, and Camp Seafare twice at a total cost of

---

[1] The numbering in the trial court's order inadvertently reverts from finding of fact #38 to #31. We have reproduced the findings of fact as originally written.

$12,000.00. Defendant paid approximately $1,250 of the $12,000 (total costs for camp) for half of [the child]'s camp in 2017.

12. After the parties separated, Plaintiff would submit the minor children's uninsured medical bills to Defendant, and he would reimburse Plaintiff for his one-half share. Plaintiff last submitted the minor children's uninsured medical bills to Defendant in 2019 because Defendant quit reimbursing her. Between 16 July 2019 and 9 January 2023 Plaintiff paid $11,523.89 in uninsured medical bills on behalf of the minor children. Defendant has failed to reimburse Plaintiff for his one-half share.

13. Defendant has been involved in the construction business as a trim carpenter during the entire marriage of the parties.

14. When the parties married, Defendant did interior trim work for Trim Works. He made approximately $18.00 - $20.00 per hour.

15. In 2004, Defendant started Elite Custom Builders, LLC (Elite). He later incorporated Elite as an S Corp. During the parties' marriage and prior to their separation, Defendant (through Elite) worked almost exclusively as a trim work subcontractor with Plaintiff's father's business, Mutual Builder's Inc.

16. Defendant's income was approximately $116,026.00 in 2015 and approximately $144,598.00 in 2016.

17. Defendant's (Elite) last job with Mutual Builder's was started prior to the parties' separation and finished in December 2017.

18. Defendant (Elite) did not perform any new jobs for Plaintiff's father's business, Mutual Builder's Inc., after the parties separated on 8 May 2017.

19. Defendant made no effort to obtain [any more] work as a trim worker through Mutual or anyone else (company

or contractor) after the date of separation.

20. After November 2017 Defendant decided to start building houses. Defendant registered Dewitt Keith's (Defendant's brother) residential general contracting license for Elite even though Dewitt Keith was not employed by Elite.

21. Defendant claimed to have started pursuing his General Contractor's license but never followed through with it.

22. In 2018 Defendant purchased a vacant lot located at 16 Tupelo Trail, Four Oaks, N.C. Elite completed construction of a home on this lot in October 2018 and sold it in October 2019 for $313,500.00.

23. In 2018, Defendant purchased another vacant lot at 874 Riverwood Drive Clayton, N.C. Elite did not start construction on a house on this lot until 2022.

24. In 2018 Defendant purchased another vacant lot at 1048 Dixon Rd., Willow Springs, N.C. Elite constructed a house on the lot and sold it in May 2020. Elite received approximately $50,000.00 from the sale of this property.

25. In 2018 Defendant performed renovation work on a warehouse in Beulaville, N.C.

26. From date of separation until January 2022 Defendant ran Elite as his full-time employment.

27. In April 2022 Elite merged with Diamond Renovations (Diamond) to become Riverside Custom Builders, Inc. (RCB), a general contracting residential construction and remodeling business. Diamond was owned and operated by Defendant's brother, Dewitt Keith.

28. Defendant and Dewitt Keith are 50–50 owners of RCB, with Dewitt Keith as the President and Defendant as the Vice President. Defendant and his brother each

invested $200,000.00 into RCB. Defendant invested his truck, tools, trailer, the lot at 874 Riverwood Dr. (Riverwood), Clayton, N.C. and $74,079.69 in cash.

29. RCB traded in Defendant's truck for a 2022 Silverado truck valued at approximately $80,000.00. Defendant drives this truck most of the time.

30. RCB started construction on the Riverwood lot in January 2022, and completed construction on it in December 2022. The house is listed for sale at $698,000.00.

31. In 2022 RCB purchased a lot at 185 Riverglade Dr., Clayton, N.C. for $83,000.00 cash.

32. In 2022 RCB purchased 3 additional lots. Two of the lots are at Oak Island, N.C., and the other lot is located at Boiling Springs, N.C. RCB is building houses on these lots. The Oak Island homes will be listed for sale at approximately $750,000.00 to $775,000.00 each.

33. Since the RCB deposition on 28 September 2022, RCB purchased a lot in Southport located at 5359 Glenfield Circle. RCB is currently building a residential home on this lot and plans to list it for sale at approximately $400,000 in 2023. RCB purchased the lot for $57,500 without financing.

34. Since the RCB deposition in September 2022, RCB purchased a lot in Clayton located at 32 Hickory Ridge Lane in the Middle Creek West subdivision. RCB plans to build a residential home on this lot in 2023 after selling another home.

35. Defendant does approximately all the onsite labor for RCB, and all the remodeling jobs for RCB. Defendant's brother, Dewitt Keith, handles RCB's finances.

36. Dewitt Keith is not aware of any jobs done through RCB that have been a "loss" for the business.

37. Defendant and Dewitt Keith both stated they do not use any software or other form of accounting system to track their expenses for each project.

38. Defendant and Dewitt Keith do not keep a written record of who their customers are.

31. Defendant and his brother, Dewitt Keith, decided on Defendant's current salary. Defendant earns $2,000.00 per month from RCB. Defendant and his brother will review Defendant's salary every year. Defendant provided no documentation that Defendant and his brother relied on to select his salary.

32. In September 2022 Defendant, his brother, Dewitt Keith, and John Perry started Elite Custom Plumbing (ECP), each as one-third owners. RCB plans to use ECP for all its plumbing jobs in its residential construction. Defendant invested approximately $10,000.00-$15,000.00 into ECP initially. John Perry, who is the plumber, contributed his tools and plumbing license, but no money. John Perry earns approximately $1,100.00 per week from ECP.

33. Defendant, Dewitt Keith, and John Perry as ECP agreed to pay Robert Thomas $15.00 per hour as a plumber's helper.

34. In 2019 Defendant listed his business on Angie Leads. Angie Leads works by connecting consumers with local companies for the type of work the consumer is seeking. Defendant had to pay every time he got a lead. Defendant connected with 92% of his leads and gave his quote for the work. Defendant did not provide any documentation of which leads led to jobs and how much he made performing those jobs.

35. Since the parties' separation, Defendant has done construction and renovation work for Lynn Daniels, Carrie Parker, Charlie Hansen, Charles Hansen, Matthew Childress, Dewitt Keith, Diane Ross, and Chester Simmons. Defendant did not charge for some of

the jobs, but Defendant did not produce records or documentation of any of the paid jobs.

36. Defendant's monthly living expenses are $2,500.00-$2,600.00.

37. On 11 November 2022 Defendant remarried. Defendant's new wife has 4 children, of which 3 live with Defendant and his new wife. Defendant claimed his new wife assists him in paying his monthly living expenses, but provided no documentation.

38. Defendant's claim of his current salary being $2,000.00 gross income per month equals $11.54 per hour.
$2,000.00 x 12 = $24,000.00
$24,000.00 ÷ 52 = $461.54
$461.54 ÷ 40 = $11.54

39. Defendant made a minimum of $18.00-$20.00 per hour during the entire marriage.

40. Defendant realized a gain from the sale of Nottingham Place and a gain from the sale of Second Street.

41. Defendant has not paid Plaintiff any child support since July 2019 because he believes Plaintiff makes sufficiently more income than him, and he keeps the children the same amount of time as Plaintiff, which is not true.

42. The parties never struggled to financially support the children during the marriage.

43. Defendant has acted in bad faith in that he has failed to exercise reasonable capacity to earn, has acted in deliberate disregard for his support obligations, and is intentionally depressing his income to an artificial low, in that:

   (a) Defendant has failed to seek employment as a trim subcontractor with a business that could pay more than $2,000.00 per month;

(b) Defendant has consistently earned more than $2,000.00 per month during the marriage;

(c) Defendant has control over his income, in that Defendant and his brother arbitrarily selected Defendant's gross income of $2,000.00 per month from ECP. There was no documentation as to how they arrived at that amount, and Defendant has testified that he doesn't feel like he should have to pay Plaintiff child support because she earns more income than him.

(d) Defendant has control over his income, in that like ECB, Defendant, Defendant's brother, and John Perry formed ECP, each as one-third owners, and is paying Mr. Perry $1,100.00 per week. There was no documentation as to how they arrived at that amount.

44. Due to Defendant's bad faith, Defendant's income will be imputed for child support.

45. Defendant's income will be imputed to $4,766.66 per month. The basis for the amount imputed is that when the parties got married, Defendant was earning $18.00 -$20.00 per hour. When Defendant started Elite and was working exclusively for Plaintiff's father, he was making a gross income in excess of $100,000.00 per year. Defendant agreed to pay a plumber $1,100.00 per week in the new start up business, Elite Custom Plumbing, which will be doing all the plumbing work for Riverside Custom Builders. Defendant should be able to earn the same as John Perry, a person whose work Defendant will be overseeing. Defendant should also be paid more than ECP plumber's helper, who will earn approximately $2,275.00 per month. ($15.00 per hour at average of 35 hours per week).

Based on these findings of fact, the trial court concluded in relevant part:

2. The provisions of child support as set forth herein are reasonable, given the reasonable needs of the minor

children, the relative ability of the parties to provide support, and in accordance with the North Carolina Child Support Guidelines.

3. Defendant has the present ability to pay or can take necessary steps to pay the child support as hereinafter set forth.

4. Plaintiff is in need of child support.

5. Defendant has failed to exercise reasonable capacity to earn, has acted in deliberate disregard for his support obligations, and intentionally depressed his income to an artificial low, in order to avoid his duty of support to his minor children.

6. Defendant acted in bad faith such that income may be imputed to him.

The trial court ordered Defendant to pay child support to Plaintiff in the amount of $692.80 per month beginning on 1 June 2023, and to "reimburse Plaintiff $32,561.60 for retroactive child support from July 2019 through May 2023 by paying $307.20 per month until arrears are paid in full." The court also ordered Defendant to "reimburse Plaintiff $5,761.95 for his one-half share of the children's medical/dental costs paid by Plaintiff between 16 July 2019 and 9 January 2023" and to "reimburse Plaintiff $4,750 ($12,000 / 2 = $6,000 - $1,250 = $4,750) for his remaining half of [their child]'s fee for Camp Don Lee/Camp Seafare."

Defendant timely filed notice of appeal.

## II. Discussion

On appeal, Defendant first argues that "the trial court fail[ed] to find facts sufficient to determine [that he] acted in 'bad faith' in order to impute income for child

support purposes[.]" Defendant also argues that the trial court erred or abused its discretion in determining the amounts of (1) imputed income, (2) past-prospective child support, and (3) extraordinary expenses.

## A. Standard of Review

"When determining a child support award, a trial judge has a high level of discretion, not only in setting the amount of the award, but also in establishing an appropriate remedy." *Taylor v. Taylor*, 128 N.C. App. 180, 182, 493 S.E.2d 819, 820 (1997). Because "[c]hild support orders entered by a trial court are accorded substantial deference by appellate courts[,] . . . our review is limited to a determination of whether there was a clear abuse of discretion." *Jonna v. Yaramada*, 273 N.C. App. 93, 100, 848 S.E.2d 33, 41 (2020) (citation omitted). "Under this standard of review, the trial court's ruling will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation omitted).

"Further, to ensure the trial court correctly exercised its function to find the facts and apply the law thereto, we ensure evidence supports findings; findings support conclusions; and conclusions support the judgment." *Cash v. Cash*, 286 N.C. App. 196, 202, 880 S.E.2d 718, 724 (2022) (cleaned up). "A trial court must make sufficient findings of fact and conclusions of law to allow the reviewing court to determine whether a judgment, and the legal conclusions that underlie it, represent a correct application of the law." *McKyer v. McKyer*, 179 N.C. App. 132, 148, 632

S.E.2d 828, 837 (2006) (cleaned up), *disc. review denied*, 361 N.C. 356, 646 S.E.2d 115 (2007). "Such findings are necessary to an appellate court's determination of whether the judge's order is sufficiently supported by competent evidence." *Craven Cty. ex rel. Wooten v. Hageb*, 277 N.C. App. 586, 589, 861 S.E.2d 571, 574 (2021) (citation omitted).

"[T]his Court is bound by the trial court's findings where there is competent evidence to support them." *Cash*, 286 N.C. App. at 202, 880 S.E.2d at 725 (citation omitted). In particular, "evidentiary issues concerning credibility, contradictions, and discrepancies are for the trial court—as the fact-finder—to resolve and, therefore, the trial court's findings of fact are conclusive on appeal if there is competent evidence to support them despite the existence of evidence that might support a contrary finding." *Sergeef v. Sergeef*, 250 N.C. App. 404, 406–07, 792 S.E.2d 192, 194 (2016) (cleaned up). Finally, "[w]hen an appellant does not challenge the trial court's findings of fact on appeal, they are binding." *Cash*, 286 N.C. App. at 202, 880 S.E.2d at 725.

## B. Imputed Income

"The calculation of child support is governed by North Carolina Child Support Guidelines established by the Conference of Chief District Court Judges." *Hageb*, 277 N.C. App. at 589, 861 S.E.2d at 574 (citation omitted). "Normally, a party's ability to pay child support is determined by that party's income at the time the award is made." *Cash*, 286 N.C. App. at 200, 880 S.E.2d at 723 (citation omitted). In

appropriate circumstances, the trial court may base child support upon a party's earning capacity:

> However, capacity to earn may be the basis for an award where the party deliberately depressed his income or deliberately acted in disregard of his obligation to provide support. Before earning capacity may be used as the basis of an award, there must be a showing that the actions which reduced the party's income were taken in bad faith, to avoid family responsibilities.

*Id.* (citation omitted); *see also* N.C. Child Support Guidelines, at 3 (2023) ("If the court finds that a parent's voluntary unemployment or underemployment is the result of the parent's bad faith or deliberate suppression of income to avoid or minimize his or her child support obligation, child support may be calculated based on the parent's potential, rather than actual, income."). "This Court also refers to the use of earning capacity to determine a party's child support obligation as 'imputation of income.'" *Cash*, 286 N.C. App. at 201, 880 S.E.2d at 724.

When considering whether to impute income to a party, several factors may support a court's determination that the party acted in bad faith, such as:

> (1) failing to exercise his reasonable capacity to earn, (2) deliberately avoiding his family's financial responsibilities, (3) acting in deliberate disregard for his support obligations, (4) refusing to seek or to accept gainful employment, (5) willfully refusing to secure or take a job, (6) deliberately not applying himself to his business, (7) intentionally depressing his income to an artificial low, or (8) intentionally leaving his employment to go into another business.

*Id.* at 208, 880 S.E.2d at 728 (citation omitted).

These factors are not exclusive, and "the dispositive issue is whether a party is motivated by a desire to avoid his reasonable support obligations." *Id.* at 211–12, 880 S.E.2d at 730 (cleaned up). A party's motivation or intent is a mental state, which "must ordinarily be proven, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be proven may be inferred. Further, a determination of bad faith in conjunction with suppression of income is best made on a case-by-case basis." *Roberts v. McAllister*, 174 N.C. App. 369, 378–79, 621 S.E.2d 191, 198 (2005) (cleaned up).

### 1. *Findings of Fact*

Defendant first asserts that the trial court did not make sufficient findings of fact to support its determination that he acted in bad faith for the purpose of imputing income to him. Defendant posits that "[w]hile [Plaintiff] may desire that [Defendant] had more income at the time of trial, there was not sufficient evidence that he was acting in bad faith to avoid his obligation, and it was error for the trial court to so find."

However, Defendant only challenges finding of fact #43, which restates and summarizes the other findings to explain the court's reasoning for determining that Defendant acted in bad faith, but which is composed solely of facts established in the other unchallenged findings. Consequently, rather than challenging the substance of the findings of fact, Defendant ultimately challenges the weight to which the court assigned certain findings and critiques the court's failure to make findings that he

would have preferred.

For example, Defendant observes that the trial court "seem[ed] to place a significant emphasis on [his] earnings during the course of the marriage," and "seem[ed] to rely heavily on its finding that [he] does not feel like he should have to pay child support because he earns less than [Plaintiff] in its determination of bad faith." Defendant asserts that the findings that he "failed to seek employment as a trim contractor with a business that could pay more than $2,000.00 per month" and also that "he earned more than that amount during the marriage are not, on their own, sufficient to support use of the earning capacity rule."

Defendant does not challenge the evidentiary basis for these findings—rendering them binding on appeal, *see Cash*, 286 N.C. App. at 202, 880 S.E.2d at 725—but instead claims that "[n]o evidence was presented, and the court made no findings, that any prevailing job opportunities as a 'trim contractor' were available to" him. Defendant further complains that the trial court made "no findings as to the needs for such services in the community or what [he] could be expected to earn in a position not supplied by his ex-wife's father."

In addition to challenging the trial court's weighing of the evidence, Defendant directs us to testimony from the hearing below that he posits would either contradict the court's findings or support hypothetical, alternative findings that the court chose not to make. For instance, Defendant notes that there was "both evidence and testimony that [he] made voluntary payments for two years after the parties'

separation in excess of what the trial court found his prospective child support obligation to be." Defendant maintains that "[t]his negates any supposition that he acted with naive indifference or deliberate disregard of his support obligations."

In making this and similar arguments, Defendant essentially asserts "that the trial court erred by overlooking evidence that he presented at trial, or by making a credibility determination with which he disagrees. These arguments go to the weight to be given to the evidence, and to evaluations of credibility which are within the discretion of the trial court." *Jonna*, 273 N.C. App. at 121, 848 S.E.2d at 53–54. Therefore, we decline Defendant's invitation to revisit the issue of imputed income and instead focus on the sufficiency of those findings of fact that the trial court actually made. *See id.* at 121, 848 S.E.2d at 54 ("Where the trial court's findings of fact are supported by competent evidence, and the findings of fact, in turn, support the trial court's conclusions of law, the decision of the trial court will be affirmed. *This Court will not reweigh the evidence.*" (cleaned up)).

The trial court's findings of fact are deemed supported by competent evidence because Defendant has not challenged their evidentiary basis, and are therefore binding. *See Cash*, 286 N.C. App. at 202, 880 S.E.2d at 725. We are similarly bound by the court's determinations—as reflected in the trial court's unchallenged findings—regarding the credibility of witnesses and the weight to be afforded to the evidence, despite Defendant's invocation of evidence that could have supported alternative findings. *See Jonna*, 273 N.C. App. at 121, 848 S.E.2d at 53–54.

"In turn, these [unchallenged] findings provide ample support for the trial court's decision to impute income to" Defendant. *McKyer*, 179 N.C. App. at 147, 632 S.E.2d at 837. The court's findings sufficiently paint a picture of Defendant intentionally leaving his employment to start his own business—into which he invested significant assets and which has been successful enough that Defendant's brother was unaware of any jobs that have resulted in a "loss" for the business—while disregarding his child-support obligations and refusing to seek compensation commensurate with his experience and income potential. For example, during the time that Defendant was receiving a salary that failed to cover his monthly living expenses, he nevertheless obtained an $80,000 truck from RCB, which the court found he "drives . . . most of the time."

Defendant has not demonstrated that the trial court's determination that he acted in bad faith, such that income may be imputed to him, "was so arbitrary that it could not have been the result of a reasoned decision." *Jonna*, 273 N.C. App. at 100, 848 S.E.2d at 41 (citation omitted). Accordingly, Defendant's first argument is overruled.

## 2. *Calculation of Imputed Income*

Defendant next argues that the trial court abused its discretion in calculating the amount of income to impute to him for child-support purposes. The North Carolina Child Support Guidelines provide a framework for this calculation:

> The amount of potential income imputed to a parent must

be based on the parent's assets, residence, employment potential and probable earnings level, based on the parent's recent work history, occupational qualifications and prevailing job opportunities and earning levels in the community and other relevant background factors relating to the parent's actual earning potential. If the parent has no recent work history or vocational training, potential income should not be less than the minimum hourly wage for a 35-hour work week.

N.C. Child Support Guidelines, at 3.

Defendant likens this case to *McKyer*, in which this Court determined that the trial court's findings of fact were "insufficient to support the trial court's determination of *the amount of income* that should be imputed[.]" 179 N.C. App at 147–48, 632 S.E.2d at 837. In that case, the court imputed "a modest additional amount of income to [the defendant]: five days a week . . . rather than one day, at $7.50/hour, for a total of $1300/month rather than the $260/month he actually earn[ed]." *Id.* at 147, 632 S.E.2d at 837. The basis for the trial court's calculation of the defendant's imputed income "was only that [the defendant's] employer . . . was 'very flexible.' " *Id.* at 148, 632 S.E.2d at 837. "The court made no finding that this employer would permit [the defendant] to work five days per week, at $7.50 per hour, rather than the one day per week he had been working prior to trial." *Id.* "Rather, the court found that no evidence was presented that [the defendant] could not work more hours at this employment. This finding [wa]s not sufficient to support the amount imputed." *Id.* (cleaned up).

Here, the trial court determined that "Defendant's income will be imputed to

$4,766.66 per month." The court explained that this amount was based on Defendant's past income, his employment potential, and earning levels in the community, as demonstrated by the income of a plumber and the plumber's assistant in Defendant's employ:

> The basis for the amount imputed is that when the parties got married, Defendant was earning $18.00-$20.00 per hour. When Defendant started Elite and was working exclusively for Plaintiff's father, he was making a gross income in excess of $100,000.00 per year. Defendant agreed to pay a plumber $1,100.00 per week in the new start up business, Elite Custom Plumbing, which will be doing all the plumbing work for Riverside Custom Builders. Defendant should be able to earn the same as John Perry, a person whose work Defendant will be overseeing. Defendant should also be paid more than ECP plumber's helper, who will earn approximately $2,275.00 per month. ($15.00 per hour at average of 35 hours per week).

The trial court's unchallenged findings of fact—which are extensive and thorough—support the figures used by the court in this calculation; the imputed-income amount of $4,766.66 is equivalent to the $1,100.00 weekly salary of the plumber. This distinguishes the case at bar from *McKyer*, in which the *sole* basis for the trial court's calculation of imputed income was a finding that the defendant's employer was "very flexible[,]" from which the court—without making any supporting findings of fact—speculated that the defendant "could move from a very limited, one day per week part-time job to full-time employment[.]" *Id.*; *see also Respess v. Respess*, 232 N.C. App. 611, 631, 754 S.E.2d 691, 704–05 (2014) (remanding order for additional findings of fact detailing the calculation of the amount of imputed income

where "the findings d[id] not establish any basis for the court's imputation in 2011 of half of what he earned in 2005, as opposed to some other fraction or amount").

The trial court's use of the plumber's salary as an illustrative proxy for Defendant's earning capacity was a reasoned response to the opacity of Defendant's financial circumstances. This is especially true in that the court's unchallenged findings establish that Defendant neglected to produce the sort of documentation that might have assisted it in making a more direct calculation of his earning capacity. As the trial court found: "Defendant provided no documentation that Defendant and his brother relied on to select his salary" of $2,000.00 per month. Indeed, Defendant and his brother, who manages RCB's finances, contend that they "do not use any software or other form of accounting system to track their expenses for each project" and "do not keep a written record of who their customers are." Despite this lack of recorded accounting, the court noted that "RCB traded in Defendant's truck for a 2022 Silverado truck valued at approximately $80,000.00[,]" which "Defendant drives . . . most of the time[,]" and that Defendant's brother was "not aware of any jobs done through RCB that have been a 'loss' for the business."

These findings of fact—along with the finding that Defendant "believes Plaintiff makes sufficiently more income than him, and he keeps the children the same amount of time as Plaintiff, which is not true"—amply demonstrate that the court found Defendant not to be credible, a determination we will not revisit on appeal. "Although a party may disagree with the trial court's credibility and weight

determinations, those determinations are solely within the province of the trial court." *Jonna*, 273 N.C. App. at 119–20, 848 S.E.2d at 53 (citation omitted).

Consequently, the trial court made a reasoned decision as to Defendant's earning capacity based on factors identified by the Guidelines, given the evidence presented. Defendant thus fails to persuade that the trial court's calculation "was so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 100, 848 S.E.2d at 41 (citation omitted).

## C. Past-Prospective Child Support

Defendant next argues that the trial court erred in ordering him to "reimburse Plaintiff $32,561.60 for retroactive child support from July 2019 through May 2023 by paying $307.20 per month until arrears are paid in full." Defendant contends that the court abused its discretion because it "utilized a child support amount predicated upon [his] imputed income from his business that was created in April 2022 and applied it retroactively to a time period well before, as far back as July 2019."

Defendant correctly observes that this reimbursement—which the trial court described as "retroactive child support"—is more appropriately considered "past-prospective child support." *See, e.g.*, *Miller v. Miller*, 153 N.C. App. 40, 48, 568 S.E.2d 914, 919 (2002) ("[O]ur Court has previously held that child support which is awarded from the time a party files a complaint for child support to the date of trial is not retroactive child support, but is in the nature of prospective child support representing that period from the time a complaint seeking child support is filed to

the date of trial." (cleaned up)).

In this case, the trial court set an effective date of July 2019 for past-prospective child support, a date after Plaintiff filed her complaint for child support on 23 August 2017. The court thus deviated from the Guidelines. *See State ex rel. Miller v. Hinton*, 147 N.C. App. 700, 706, 556 S.E.2d 634, 639 (2001) ("Unless the trial court finds that beginning the prospective child support payments on the date the complaint was filed would be 'unjust or inappropriate' and there is evidence in the record to support this finding, it is error to order prospective support to begin at any other time.").

The trial court's decision to deviate from the Guidelines is properly informed by the Guidelines themselves:

> The court upon its own motion or upon motion of a party may deviate from the [G]uidelines if, after hearing evidence and making findings regarding the reasonable needs of the child for support and the relative ability of each parent to provide support, it finds by the greater weight of the evidence that application of the [G]uidelines would not meet, or would exceed, the reasonable needs of the child considering the relative ability of each parent to provide support, or would otherwise be unjust or inappropriate.

N.C. Child Support Guidelines, at 1.

If the trial court decides to deviate from the Guidelines, it must make written findings of fact

> (1) stating the amount of the supporting parent's presumptive child support obligation determined pursuant

> to these [G]uidelines, (2) determining the reasonable needs of the child and the relative ability of each parent to provide support, (3) supporting the court's conclusion that the presumptive amount of child support determined under the [G]uidelines is inadequate or excessive or that application of the [G]uidelines is otherwise unjust or inappropriate, and (4) stating the basis on which the court determined the amount of child support ordered.

*Id.*

Additionally, if the trial court deviates from the Guidelines to award past-prospective child support based upon a variation in a parent's income over time, the court must make appropriate findings of fact regarding this variation. *See Simms v. Bolger*, 264 N.C. App. 442, 453, 826 S.E.2d 522, 531 (2019) (reversing past-prospective child support award where "the trial court made no findings providing a rationale for using [the d]efendant's income for each individual year rather than using his current income to calculate child support owed back to the filing of [the p]laintiff's motion"). Although "this Court has recognized such an approach is permissible where the income is highly variable or seasonal, or where the evidence of income is unreliable[,]" the *Simms* Court explained that "[w]hat matters in these circumstances is the reason *why* the trial court examines past income; the court's findings must show that the court used this evidence to accurately assess current monthly gross income." *Id.* at 453, 826 S.E.2d at 530 (citation omitted).

In the instant case, the trial court presumably based its July 2019 effective date for past-prospective child support upon the fact that Defendant paid Plaintiff

child support until July 2019. As Defendant notes in his appellate brief, while the court was not explicit in its order, the $32,561.60 award "was seemingly reached by applying the ordered amount of $692.80 prospective support for the 47-month period between July 2019 and the conclusion of the trial." It therefore appears that the trial court deviated from the Guidelines by bifurcating the past-prospective child support to reflect two different time periods: a sum of $0 representing the period from the filing of Plaintiff's complaint until July 2019, and then a sum of $32,561.60 representing the period from July 2019 until the conclusion of the hearing.

Notwithstanding Defendant's contention that "the use of [the imputed-income] figure to calculate past prospective support for the time period before May 2022 is improper[,]" we reiterate that the trial court "has a high level of discretion, not only in setting the amount of the award, but also in establishing an appropriate remedy." *Taylor*, 128 N.C. App. at 182, 493 S.E.2d at 820. We also reiterate that this Court has recognized that deviating from the Guidelines by using historical income to calculate past-prospective child support may be permissible in certain cases where the findings of fact suggest that a parent's income was "highly variable" or "the evidence of income is unreliable." *Simms*, 264 N.C. App. at 453, 826 S.E.2d at 530 (citation omitted).

However, in order to properly deviate from the Guidelines, the trial court must make specific "findings providing a rationale" for its decision, consistent with both the Guidelines and our precedents. *Id.* at 453, 826 S.E.2d at 531. Although the order from which Defendant appeals is thorough and detailed, the court nevertheless left

implicit the rationale for its past-prospective child support award, rather than making the explicit findings and conclusions required. Accordingly, we must remand this matter to the trial court. *See id.*

If, on remand, the trial court determines that deviating from the Guidelines would be appropriate to meet the reasonable needs of the children and the parents' relative abilities to pay, and that the presumptive amount of child support under the Guidelines would be inadequate, excessive, or otherwise unjust or inappropriate, then the court shall make the concordant findings required by the Guidelines. *See id.*; *see also* N.C. Child Support Guidelines, at 1.

**D. Extraordinary Expenses**

Finally, Defendant argues that the trial court erred by ordering him "to reimburse [Plaintiff] the amount of $4,750.00 'for his remaining half of [their child]'s fee for Camp Don Lee/Camp Seafare.' "

The Guidelines allow the trial court to add extraordinary child-related expenses to the parties' basic child-support obligation, to be paid by the parents "in proportion to their respective incomes if the court determines the expenses are reasonable, necessary, and in the child's best interest." N.C. Child Support Guidelines, at 5; *see Klein v. Klein*, 290 N.C. App. 570, 597, 892 S.E.2d 894, 915 (2023). It is undisputed that a child's camp fees may fall within the category of extraordinary expenses with respect to child support. *See, e.g.*, *Wadsworth v. Wadsworth*, 281 N.C. App. 201, 207, 868 S.E.2d 636, 641 (2021); *Balawejder v. Balawejder*, 216 N.C. App.

301, 317, 721 S.E.2d 679, 688–89 (2011); *Mackins v. Mackins*, 114 N.C. App. 538, 550, 442 S.E.2d 352, 359, *disc. review denied*, 337 N.C. 694, 448 S.E.2d 527 (1994).

Defendant alleges that "the trial court's determination that [he] owed 'half' of the prior camp expenses was made without any findings that they were reasonable, necessary, and in the child's best interest." Defendant also contends that "the trial court clearly did not assign this expense to the parties 'in proportion to their respective incomes.' "

Here, as with the past-prospective child support award, the trial court left implicit its basis for ordering that Defendant reimburse Plaintiff for half of the prior camp expenses. On remand, "if the court determines the expenses are reasonable, necessary, and in the child's best interest[,]" N.C. Child Support Guidelines, at 5, the trial court shall make findings of fact reflecting that determination and prorate this extraordinary expense based on the parties' incomes absent a request to deviate from the Guidelines.

## III.    Conclusion

For the foregoing reasons, the trial court's determination that Defendant acted in bad faith, such that income may be imputed to him for the purposes of child support, is affirmed. In that Defendant is unable to show that the court abused its discretion in calculating the amount of imputed income, this determination is also affirmed.

However, we remand to the trial court for additional findings of fact regarding

the past-prospective child support awarded to Plaintiff and the reimbursement to Plaintiff of a portion of one of the children's camp expenses. "On remand, the trial court shall rely upon the existing record, but may in its sole discretion receive such further evidence and further argument from the parties as it deems necessary and appropriate to comply with the instant opinion." *Hageb*, 277 N.C. App. at 591, 861 S.E.2d at 575 (cleaned up).

AFFIRMED IN PART; REMANDED FOR ADDITIONAL FINDINGS OF FACT.

Judges ARROWOOD and GRIFFIN concur.